# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

**FILED**
**May 1, 2026**

ASHLEY N. DEEM, CHIEF DEPUTY CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**GARY PALMER,**
**Claimant Below, Petitioner**

**v.) No. 25-ICA-346**    (JCN: 2025005906)

**LOAR HOLDINGS, INC.,**
**Employer Below, Respondent**

## MEMORANDUM DECISION

Petitioner Gary Palmer appeals the July 30, 2025, order of the Workers' Compensation Board of Review ("Board"), which affirmed the claim administrator's order and found Mr. Palmer failed to establish that he sustained an occupational injury or disease in the course of and resulting from his employment. Respondent Loar Holdings, Inc. ("Loar") filed a response.[1] Mr. Palmer did not file a reply.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2024). After considering the parties' arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the Board's order is appropriate under Rule 21 of the West Virginia Rules of Appellate Procedure.

On February 5, 2025, Mr. Palmer presented to the emergency department at Summersville Regional Medical Center stating he had experienced dizziness, lethargy, decreased energy, bowel bubbling with constipation, mental fogginess, and occasional shortness of breath for the last three days. Mr. Palmer stated he did not have a history of these symptoms. A urine test was performed and showed a small amount of ketones, consistent with contamination, and a trace of blood. The medical provider diagnosed Mr. Palmer with generalized weakness and dizziness and discharged him after explaining that his condition could be viral.

On February 6, 2025, Mr. Palmer was seen by Richard Trenbath, M.D., and complained of feeling a little unsteady and dizzy. Mr. Palmer's wife stated he was also very fatigued most of the time and was short of breath. Mr. Palmer reported working with methyl ethyl ketone ("MEK"), a chemical solvent. Dr. Trenbath stated Mr. Palmer's

---

[1] Mr. Palmer is represented by Reginald D. Henry, Esq., and Lori J. Withrow, Esq. Loar is represented by T. Jonathan Cook, Esq.

symptoms were most likely related to his exposure to MEK because Mr. Palmer reported handling MEK without a respirator and sometimes without gloves. However, Dr. Trenbath noted that Mr. Palmer did not have skin irritation, wheezing, or lung issues. Dr. Trenbath performed an unofficial urine dipstick test and found Mr. Palmer had trace amounts of ketones in his urine compared to greater than 80 in the urinalysis performed at Summersville Regional Medical Center the day before. Dr. Trenbath noted that he thought Mr. Palmer's feeling of unsteadiness was due to MEK exposure, suggested Mr. Palmer not work for four days, and stated it would be good to use a respirator at work.

On February 6, 2025, Mr. Palmer signed an employee accident and incident report form stating he worked as a builder for Loar and had been diagnosed with poisoning as a result of prolonged exposure to MEK. He stated that his symptoms worsened on February 3, 2025, and he notified Loar of his injury. He indicated that no one witnessed the incident, and that he injured his head, eyes, kidneys, lungs, and neurological system. On February 10, 2025, Mr. Palmer was seen by Dr. Trenbath for a follow-up appointment and reported he was doing better but was still unable to drive and was experiencing brain fog. Dr. Trenbath told Mr. Palmer to avoid exposure to MEK, and Dr. Trenbath included information regarding MEK in his visit notes, which he obtained from Wikipedia. Dr. Trenbath also stated Mr. Palmer was injured at work where he was exposed to MEK.

On February 10, 2025, Mr. Palmer signed an Employees' and Physicians' Report of Occupational Injury or Disease ("Report of Disease") stating the date of injury or last exposure was February 3, 2025. According to the Report of Disease, Mr. Palmer stated his injuries were dizziness, fatigue, shortness of breath, lethargy, confusion, ketones in his urine, and neurological symptoms. Mr. Palmer attributed his injury to inhaling MEK fumes and using MEK in his job. The physician's portion was signed on February 15, 2025, by medical personnel at Summersville Regional Medical Center. The treatment provider stated the body part injured was the neurologic system, described the injury as weakness and dizziness, and stated these conditions were the direct result of an occupational injury. The Employer's Report of Injury is undated, unsigned, and states Mr. Palmer stopped working for Loar on February 3, 2025, due to an injury described as a chemical poisoning, other than metals. Loar described the type of injury as absorption, ingestion, or inhalation and indicated that there was no reason to question the injury.

On February 18, 2025, Dr. Trenbath contacted Mr. Palmer by phone for a follow-up appointment, and Dr. Trenbath opined that Mr. Palmer was suffering from the side effects of long-term exposure to MEK. Dr. Trenbath stated that Mr. Palmer had been off work and was starting to improve but still suffered from lack of energy, episodes of weakness, episodes of falling asleep, and some brain fog. Mr. Palmer's dizziness had resolved. On February 27, 2025, Dr. Trenbath issued a letter stating his medical opinion was that Mr. Palmer had been exposed to MEK for years through his job and was now showing side effects. Dr. Trenbath stated that Mr. Palmer suffered from dizzy spells,

excessive fatigue, brain fog, and fell asleep quickly, and he should not work while these symptoms were ongoing.

On March 19, 2025, Mr. Palmer was seen again by Dr. Trenbath for a follow-up examination and reported new symptoms including headaches, fatigue, mild memory loss, and vision loss. Mr. Palmer stated he was evaluated by an eye doctor and had twenty-twenty vision, but Dr. Trenbath suggested that Mr. Palmer may be suffering from ocular migraines. Dr. Trenbath also requested authorization for Mr. Palmer to see a neurologist. On March 31, 2025, the claim administrator denied Mr. Palmer's claim for workers' compensation benefits. The order stated that it appeared an incident may have occurred in the workplace but that the evidence did not support a specific diagnosis. Mr. Palmer protested this order. After the claim was denied, Mr. Palmer returned to Dr. Trenbath for a follow-up appointment on April 23, 2025, and Dr. Trenbath stated that he disagreed with the claim denial because he felt Mr. Palmer was affected by MEK both neurologically and mentally.

In a report dated May 13, 2025, Chris Warnick, MSIH, CSP, CIH of Benchmark Safety, Health, & Environmental Services, issued a report related to a facility assessment conducted on April 25, 2025, to evaluate Loar's employees' exposure levels to various health stressors. An assessment, including air sampling, was performed on a variety of stressors, including MEK and toluene. Mr. Warnick stated that an employee's main risk factors were from MEK and toluene and noted safety glasses and disposable nitrile gloves were provided. The report concluded that the sample results were well below the Occupational Safety and Health Administration's ("OSHA") permissible exposure limits ("PELs").

On May 19, 2025, Mr. Palmer was again seen by Dr. Trenbath and reported that he still had unsteadiness, brain fog, occasional headaches, and some ataxia. Dr. Trenbath ordered an MRI of the brain. On June 2, 2025, Dr. Trenbath signed a Workers' Compensation Diagnosis Update listing Mr. Palmer's primary diagnosis as occupational exposure to other air contaminants and a secondary diagnosis of occupational exposure.

On June 16, 2025, Mr. Palmer was deposed and testified that he had been employed by Loar to build deicers for airplanes for about fifteen years, and his job required him to work with rubber cement material, different gases, and chemical mixtures. He typically worked ten-hour days and worked at least forty hours per week. He testified that he worked with MEK daily for his entire shift and was exposed to MEK through the air and from skin absorption. According to Mr. Palmer, he was not provided with a respirator, but dust masks were available. He stated that Loar did provide gloves, but he used them repeatedly until holes were worn in them from MEK, exposing his skin to the chemical. He stated it was difficult to estimate how often MEK came in contact with his skin but estimated it was not often. Mr. Palmer recounted an incident where the cabinet that held the gloves was locked for a week or more, and employees had to reuse gloves. He stated that Loar was aware of

this issue and both supervisors and maintenance were alerted. When asked to describe the air flow while working, Mr. Palmer stated Loar had fans both inside and outside the building to circulate air, but he felt the ventilation system was not effective. He stated that the air flow was interrupted in the summer and winter because employees used personal fans when it got hot and turned the inside fans off when it got cold.

Mr. Palmer further testified that he felt extremely dizzy, fatigued, and thought he would pass out while at work on February 3, 2025. He had experienced these symptoms for a couple of months prior, but they usually passed within fifteen to twenty minutes after he sat down. He stated that these symptoms were sporadic, but he did not notice any triggers other than they would begin around noon. He decided to go to the emergency department on February 5, 2025, because his symptoms were extreme. At the time of his deposition, Mr. Palmer's symptoms were lightheadedness, headaches, occasional confusion, extreme fatigue, and eye aches and that these symptoms occurred daily with variable intensities. Mr. Palmer further testified that he had not worked since February 3, 2025, but his symptoms remained consistent. He was unable to work long shifts although the symptoms did not impact his ability to do activities in his daily life. He stated that the intensity of the symptoms had slowly been improving since he stopped working.

On July 2, 2025, Fred Monnett signed an affidavit stating he had worked at Loar for approximately twenty years and currently served as the maintenance supervisor over facility operations, which included oversight of the ventilation systems and safety equipment in the building where Mr. Palmer worked. He stated that the facility provided gloves, and he was not aware of any employee being required to reuse damaged gloves. He further stated that there was an incident involving a damaged drawer in the glove cabinet, but the issue was resolved either the same day or by the next shift after maintenance restored access. However, he stated employees still had access to gloves during that time. Finally, he stated that no other employees made complaints or claims of MEK exposure during his time with Loar to his knowledge.

On that same date, Ryan Groves signed an affidavit stating he also worked for Loar and directly supervised Mr. Palmer. He stated Mr. Palmer applied MEK multiple times per shift, and that the chemical was dispensed from a small drip or squirt bottle onto a board or applied by pulling or wiping the material with a sponge or swab. He stated that nitrile gloves were worn during this process and that the total duration of the MEK application was approximately thirty minutes spread intermittently across an eight-hour shift. Finally, he stated that he was not aware of any other employees making complaints or claims of MEK exposure or of any OSHA findings identifying concerns or violations at the facility related to MEK exposure.

On July 7, 2025, Syam B. Stoll, M.D., performed a record review and provided his medical opinion that the record did not support the conclusion that Mr. Palmer was exposed to MEK in the course of his employment. Dr. Stoll opined that Dr. Trenbath's assessments

4

and opinions were unsubstantiated and not supported by objective data because Dr. Trenbath's diagnosis was based on Wikipedia searches and talking to poison control. He stated that Mr. Palmer's current ongoing subjective complaints were due to nonoccupational causes.

Loar also submitted a Ventilation Assessment and Industrial Hygiene Survey issued by Michael Haynes, who is an industrial hygienist from MSES Consultants, Inc. The survey was conducted on May 23, 2012, and evaluated areas and personnel at multiple locations throughout Loar's facility. The survey concluded that employees' exposures to hexane, MEK, toluene, and xylenes were below all regulatory limits. The MEK exposure data showed exposures from 0.91 ppm to 21.0 ppm, and Mr. Haynes stated that the 21.0 ppm exposure is almost ten times less than the PELs and the American Conference of Governmental Industrial Hygienists threshold limit values.

On July 30, 2025, the Board entered an order affirming the claim administrator's March 31, 2025, order and found that the preponderance of the evidence established that Mr. Palmer did not sustain an occupational injury or disease related to his employment. It is from this order that Mr. Palmer now appeals.

Our standard of review is set forth in West Virginia Code § 23-5-12a(b) (2022), in part, as follows:

> The Intermediate Court of Appeals may affirm the order or decision of the Workers' Compensation Board of Review or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the Workers' Compensation Board of Review, if the substantial rights of the petitioner or petitioners have been prejudiced because the Board of Review's findings are:
>
> (1) In violation of statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the Board of Review;
> (3) Made upon unlawful procedures;
> (4) Affected by other error of law;
> (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

Syl. Pt. 2, *Duff v. Kanawha Cnty. Comm'n*, 250 W. Va. 510, 905 S.E.2d 528 (2024).

On appeal, Mr. Palmer asserts one assignment of error and argues the Board was clearly wrong in finding he did not sustain an occupational disease in the course of and

resulting from his employment.[2] We disagree. To establish entitlement to workers' compensation benefits related to an occupational disease, West Virginia Code § 23-4-1(f) (2024) states, in relevant part that,

> [f]or the purposes of this chapter, occupational disease means a disease incurred in the course of and resulting from employment. No ordinary disease of life to which the general public is exposed outside of the employment is compensable except when it follows as an incident of occupational disease as defined in this chapter. Except in the case of occupational pneumoconiosis, a disease is considered to have been incurred in the course of, or to have resulted from, the employment only if it is apparent to the rational mind, upon consideration of all the circumstances: (1) That there is a direct causal connection between the conditions under which work is performed and the occupational disease; (2) that it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment; (3) that it can be fairly traced to the employment as the proximate cause; (4) that it does not come from a hazard to which workmen would have been equally exposed outside of the employment; (5) that it is incidental to the character of the business and not independent of the relation of employer and employee; and (6) that it appears to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction . . . .

"Ordinary diseases to which the general public is exposed outside of employment are not compensable, except when they follow as an incident of occupational disease." *Gwinn v. Lewis Chevrolet Co.*, No. 22-629, 2024 WL 2032740, at *4 (W. Va. May 7, 2024) (memorandum decision).

In this case, the Board noted that Mr. Palmer had been off work since February 3, 2025, and had no further MEK exposure since that date but began to develop new symptoms as detailed in the March 19, 2025, and May 19, 2025, medical records from Dr. Trenbath. The Board also acknowledged Mr. Palmer's June 16, 2025, deposition testimony stating he was still experiencing lightheadedness, headaches, occasional confusion, extreme fatigue, and eyes aching daily with different intensity despite not working or being exposed to MEK since February. The Board then referenced Mr. Monett's July 2, 2025, affidavit stating there was only a brief incident where Loar's employees did not have access to the glove drawer and found these statements more reliable than Mr. Palmer's testimony

---

[2] On the Report of Injury form, Mr. Palmer indicated this is an injury claim. However, his arguments to the Board and to this Court make it clear that Mr. Palmer is making a claim for an occupational disease.

stating the glove drawer was inaccessible anywhere from one week to one month with no access to protective gloves for that period of time. The Board also held that the evidence established that nitrile gloves are the appropriate safety items for exposure to MEK and that respirators were not required.

Based on these facts, the Board held that the preponderance of the evidence established that Dr. Trenbath's opinion that Mr. Palmer's reported symptoms were related to MEK exposure was unsubstantiated and held that nearly all the evidence supported a finding that Mr. Palmer was not exposed to hazardous levels of MEK during his employment. The Board further held that Mr. Palmer failed to show by a preponderance of evidence that he sustained an occupational injury or disease resulting from his employment pursuant to West Virginia Code § 23-4-1(f). As the Supreme Court of Appeals of West Virginia has set forth, "[t]he 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume an agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996). With this deferential standard of review in mind, we cannot conclude that the Board was clearly wrong in affirming the claim administrator's order and holding Mr. Palmer failed to establish that he sustained an occupational injury or disease in the course of and resulting from his employment.

Accordingly, we affirm the Board's July 30, 2025, order.

Affirmed.

**ISSUED:** May 1, 2026

**CONCURRED IN BY:**

Chief Judge Daniel Greear
Judge Charles O. Lorensen
Judge S. Ryan White

7